SIXTH DIVISION

No. 1-09-0908

NICK OWENS,                                    )
                                               )
                                               )
        Petitioner-Appellant,                  )        Petition for Review of
                                               )        An Order of the Chief Legal
v.                                             )        Counsel of the Illinois
                                               )        Department of Human
                                               )        Rights.
                                               )
THE DEPARTMENT OF HUMAN RIGHTS;                )
MICHAEL LIEBERMAN, Chief Legal Counsel         )
Designee of the Department of Human Rights;    )        No. 2005 CA 2283
and EXXON MOBIL CORPORATION,                   )
                                               )
        Respondents-Appellees.                 )

JUSTICE JOSEPH GORDON delivered the opinion of the court:

On February 2, 2005, petitioner-appellant, Nick Owens, filed a charge of discrimination with the Illinois Department of Human Rights (hereinafter, sometimes, the Department) alleging that his employer, Exxon Mobil Corporation (hereinafter Exxon Mobil) discriminated against him by issuing a written reprimand to him on December 13, 2004, even though he had been performing his duties in a satisfactory manner, based on his race (African American) (count A) and his age (55) (count B), in violation of section 2-102(A) of the Illinois Human Rights Act (Human Rights Act) (775 ILCS 5/2-102(A) (West 2004)). On February 23, 2005, Owens filed an amended charge adding that on February 15, 2005, despite satisfactorily performing his duties, he received a second written reprimand because of his race (count C) and age (count D), in violation of section 2-102(A) of the Human Rights Act (775 ILCS 5/2-102(A) (West 2004)), and further in retaliation for filing the subject discrimination charge (count E), in violation of section

1

6-101(A) of the Act (775 ILCS 5/6-101(A) (West 2004)). On June 27, 2005, Owens filed a second amended charge, adding that on or about April 12, 2005, Exxon Mobil subjected him to unequal terms and conditions of employment when it refused to grant his request for tuition reimbursement based upon his race (count F), his age (count G), and in retaliation for his filing the subject charge (count H).

After conducting an initial investigation, on August 3, 2007, the Department of Human Rights issued a notice of dismissal for lack of substantial evidence as to all eight counts of petitioner's charge. On January 22, 2009, however, the chief legal counsel of the Department of Human Rights vacated the dismissal order and reversed for further investigation into all counts. Upon further investigation, the Department of Human Rights issued a second order of dismissal, again finding that Owens had failed to present substantial evidence in support of his charge. This time, the chief legal counsel agreed with the findings of the Department and sustained the decision of the Department to dismiss petitioner's charge. Owens now appeals.

On appeal, Owens contends that the chief legal counsel of the Department of Human Rights abused his discretion when he sustained the decision of the Department to dismiss his discrimination charge, since he presented substantial evidence of discrimination. Owens also contends that the substantial evidence standard as articulated under section 7A-102(D)(2) of the Human Rights Act (775 ILCS 5/7A-102(D)(2) (West 2004)) is unconstitutionally vague. For the reasons that follow, we affirm.

## I. BACKGROUND

The undisputed facts establish that Owens has been employed by Exxon Mobil's Cicero

Regional Distribution Center since 1977 and that at the time of the incident he was employed as a warehouse operator.

## A. Owens' Discrimination Charge

On February 2, 2005, Owens filed a two count charge of discrimination with the Department. In count A, Owens alleged that on December 13, 2004, he was subjected to discrimination by Exxon Mobil on the basis of his race (African American), in violation of section 2-102(A) the Human Rights Act (775 ILCS 5/2-102(A) (West 2004)). In count B, Owens alleged that on that same date, he was subjected to discrimination by Exxon Mobil on the basis of his age (55 years old) violation of section 2-102(A) the Human Rights Act (775 ILCS 5/2-102(A) (West 2004)). In support of both counts A and B, Owens stated that although on the date in question he had been performing his duties in a satisfactory manner, his shift supervisor, Melvin Koziol, issued a written reprimand to him for "excessive loading time and loading errors." Owens further stated that although two similarly situated younger, white employees, Carl Pratscher, and Bryan Wright, had been cited for excessive loading time and loading errors, they were not given written reprimands for their conduct.

On February 23, 2005, Owens filed an amended charged, reiterating his earlier claims, but adding three more counts, C, D, and E. In count C, Owens alleged that on February 15, 2005, he was discriminated against on the basis of his race when he was issued a second written reprimand by shift supervisor Koziol in violation of section 2-102(A) of the Human Rights Act (775 ILCS 5/2-102(A) (West 2004)). In count D, Owens alleged that this same incident was a result of age discrimination, and violated section 2-102(A) of the Human Rights Act (775 ILCS

No. 1-09-0908

5/2-102(A) (West 2004)). Finally, in Count E, Owens alleged a claim of retaliatory discrimination pursuant to section 6-101(A) of the Act (775 ILCS 5/6-101(A) (West 2004)), contending that the February 15, 2005, written reprimand was issued to him in retaliation for his filing of the subject charge.

In support of counts C through E, Owens alleged the following facts. According to the second written reprimand, Owens had failed to perform his job duties by failing to include eight drums of "Telura 622" when loading a customer order on January 7, 2005. Owens, however, denied failing to perform his job duties on that date and explained that the eight drums of "Telura 622 " "may have been added to [his] order after [he] had gotten [his] shipping notice." Owens averred that in the past there had been instances where subsequent changes made to a shipment order were not reflected on the copy of the shipping notice given to a warehouse operator. Owens further alleged that two similarly situated younger white employees, Pratscher and Wright, had been treated differently under similar circumstances. Owens further alleged that on February 15, 2002, he engaged in a protected activity by filing a discrimination charge with the Department of Human Rights and that the issuing of the second written reprimand followed this protected activity "within such a period of time so as to raise an inference of retaliatory motive." On March 25, 2005, Exxon Mobil filed a verified response denying the material allegations of Owens' charge.

On June 27, 2005, Owens filed a second amended charge, realleging counts A through E of his earlier charges, but adding three more counts, F, G, and H. In count F, Owens alleged that on or about April 12, 2005, Exxon Mobil subjected him to unequal terms and conditions of

4

employment when it refused to grant his request for tuition reimbursement based upon his race, in violation of section 2-102(A) of the Human Rights Act (775 ILCS 5/2-102(A) (West 2004)). In count G, Owens alleged that, since at the time of this request, he was 55 years old, the denial of tuition reimbursement was also a result of age discrimination, in violation of section 2-102(A) of the Human Rights Act (775 ILCS 5/2-102(A) (West 2004)). Finally, in count H, Owens alleged a claim of retaliatory discrimination pursuant to section 6-101(A) of the Act (775 ILCS 5/6-101(A) (West 2004)) claiming that Exxon Mobil refused to grant him tuition reimbursement in retaliation for his filing of the subject discrimination charge. In support of these additional claims, Owens alleged that although on April 12, 2005, he submitted a request for tuition reimbursement to his shift supervisor, Koziol, since then "no action has been taken on his request." Owens further stated that he "believe[s]" that other similarly situated, non-African-American employees under the age of 40, namely Wright, Gary Wantroba and others, have been granted tuition reimbursements. On August 10, 2005, Exxon Mobil filed a verified response to Owens' amended charge denying the material allegations.

B. The Department's First Investigation and Dismissal

The Department of Human Rights conducted an investigation and based on its findings, on August 3, 2007, dismissed all counts of Owens' charge for lack of substantial evidence. In support of its dismissal, the Department of Human Rights attached voluminous records of its investigation. Those records reveal that during its investigation, an investigator for the Department of Human Rights interviewed several witnesses, including (1) the petitioner, Owens, (2) two retired Exxon Mobil employees (Mike Sanders and Ernest Hampton); (3) one current

Exxon Mobil employee (mechanic Jessee Thomas): (4) two members of Exxon Mobil management at the Cicero Regional Distribution Center (shift supervisor Melvin Koziol, and operations manager, Patrick O'Reilly); and (5) Exxon Mobil's in-house attorney, Judith Jansen. The investigator also reviewed voluminous documents provided by the parties, including: (1) a letter of reprimand from Koziol to Owens dated February 15, 2005; (2) a group of loading error investigation reports; and (3) a group of general disciplinary documents for Exxon Mobil employees at the Cicero Regional Distribution Plant.

With respect to counts A and B of Owens' charge, the Department's investigator reported the following evidence. When interviewed, Owens stated that on December 13, 2004, his shift supervisor Koziol issued a written warning to him for "working too slow and making excessive errors." Although Owens admitted that he sometimes works slower than other employees, he explained that he does so because "he is checking to make sure he is not making errors." Owens further stated that he believes his work performance is the same as that of other similarly situated warehouse operators, namely Wright (non-African-American, 23 year old), Steven Johnson (non-African-American, 49 years old), Michael Panozzo (non-African-American, 26 years old), Pratscher (non-African-American, 47 years old) and Daniel Hanson (non-African- American, 44 years old). According to Owens, however, these other employees have not received written reprimands for errors in their performance. Owens also stated that he believes that he was discriminated against because of his age as Exxon Mobil has a policy under which an employee may retire when he or she turns 55 and accumulates 15 years of service with the company. Owens stated that one month after he turned 55 years old, he was issued a written

No. 1-09-0908

warning.

According to the Department's investigator, Owens allegations were corroborated by statements from two retired and one current Exxon Mobil employee. Specifically, during an interview with the Department's investigator, retired filler[1], Mike Sanders (African American, 60 years old) stated that "race discrimination was going on" at the plant. Sanders explained that operations manager Patrick O'Reilly (non-African-American, 48 years old) "is a racist," who treats African American employees "unfairly" and likes to discipline them when they should not be disciplined.

Retired forklift driver[2], Ernest Hampton (African American, 68 years old) similarly told the Department's investigator that he believed that "race discrimination and a whole bunch of other things [were] going on" at the plant, but he did not elaborate.

Finally, mechanic Jesse Thomas (African American, 43 years old), told the Department's investigator that O'Reilly was "a racist," and that he referred to African Americans as "niggers" and Mexican employees as "wetbacks." Thomas also stated that O'Reilly was always disciplining African American individuals for things they "did and did not do," commenting "I'm going to get that nigger." According to Thomas, several individuals complained to management and human resources about O'Reilly's racial slurs. As a result, between 2001 and 2004, Exxon Mobil conducted an investigation into allegations of racial discrimination. Although during this investigation several managers initially attested to O'Reilly's

[1]The record reveals that Sanders retired three years prior to the instant litigation.

[2]The record reveals that Hampton retired from Exxon Mobil in May 1995.

7

discrimination against African American employees, according to Thomas, after upper management spoke to them, they were "scared off" and they refused to testify about O'Reilly's conduct.

On the other hand, the Department's investigator reported that contrary to Owens' allegations, management at Exxon Mobil's Cicero plant denied having disciplined Owens because of his race and/or age. First, shift supervisor Koziol (non-African-American, 54) told the Department investigator that on December 13, 2004, he issued Owens a "written counseling" and not a "written reprimand," and that there is a difference between the two. Koziol explained that he issued the "written counseling" to Owens because Exxon Mobil received several complaints on an order that Owens loaded on August 5, 2004. Specifically, Koziol stated that while the customer ordered 26 cases of "Mobil 1" products, 11 pails of "Mobilux EP2," 5 pails of "Mobil ShC 632" and 4 pails of Vacuoline, it received 25 cases of "Mobil 1" products; 12 pails of "Mobilux EP2," 4 pails of "Mobil ShC 632," 3 pails of Vacuoline, and 1 pail of "something without a label."

In addition, operations manager, Patrick O'Reilly told the Department investigator that Owens had made several mistakes on his orders prior to being issued the December 13, 2004, "written counseling." O'Reilly explained Exxon Mobil's procedure with issuing "written counseling" to its employees. According to O'Reilly, anytime Exxon Mobil receives a customer complaint, it investigates to determine whether the complaint is legitimate. If the company determines that the complaint is legitimate, the employee receives a "loading error" in his or her personnel file. Once an employee has three errors in his or her file, the employee receives a

record of "counseling."

With respect to the other similarly situated employees that Owens alleged were treated differently from him, O'Reilly explained that: (1) Wright and Johnson had not been issued any "counseling" or warnings because they had no loading errors; (2) Panozzo had been issued a warning for unsafe conduct on a forklift and ordered to participate in one loading error coaching session but had not been given "written counseling" since his file did not contain three loading errors; (3) Pratscher received a coaching session for a loading error, but no "counseling" since he did not commit three loading errors; and (4) Hanson received reprimands "for other things."

The Department's investigator further reported that Exxon Mobil's counsel, Judith Jansen (a non-African-American, 63 years old), confirmed that if an Exxon Mobil employee has completed 15 years of service by the time he or she reaches the age of 55, that employee can retire. Jansen explained, however, that this is a benefit plan and not a company policy and that, as such, it had nothing to do with Owens' "written counseling" record.

In addition, the Department's investigator reported that Exxon Mobil's disciplinary documents disclosed that similarly situated employees had also been issued "counseling," reprimands, warnings and suspensions, and that they had not been treated differently than Owens. The investigator summarized his analysis of these disciplinary documents in two charts: (1) the first chart showing all the disciplinary actions taken against Owens and his coworkers in the two years prior to his filing of the instant charge, and (2) the second chart summarizing all loading error investigation reports at the plant since 1999.

**CHART 1:**

No. 1-09-0908

| Date | Name | Discipline | Reason | Age | Race |
|------|------|-----------|--------|-----|------|
| 08/28/03 | Novakowski | Counseling | Failure to wear ppe | 47 | White |
| 08/29/03 | M Panozzo | Letter of Reprimand | Unsafe operation of forklift | 26 | White |
| 08/29/03 | Wantroba | Suspension | Truck spillage | 36 | White |
| 09/15/03 | T Panozzo | Counseling | Unproductive insubordination | 50 | White |
| 12/15/03 | Solis | Letter of Warning | Absenteeism | 25 | Hispanic |
| 02/96/04 | Pollack | Counseling | Absenteeism | 54 | White |
| 03/23/04 | Whittier | Counseling | Loading Errors | 37 | African American |
| 04/13/04 | Washington | Suspension | Dishonesty related to absence | 36 | African American |
| 04/22/04 | Drada | Counseling | Unacceptable absence | 55 | White |
| 05/03/04 | Bustos | Letter of Reprimand | Product contamination | 47 | Hispanic |
| 08/13/04 | Pollack | Counseling | Unacceptable absenteeism | 54 | White |
| 10/21/04 | Hansen | Suspension | Refusal to report to work | 45 | White |
| 12/07/04 | Owens (petitioner) | Counseling | Loading errors | 55 | African American |

**CHART 2:**

10

| Date | Name | Discipline | Reason | Age | Race |
|------|------|-----------|--------|-----|------|
| 11/16/05 | Hanson | Coached | Load error | 44 | White |
| 10/28/04 | M. Panozzo | Coached | Load Error | 26 | White |
| 04/19/04 | Wright | Error in file | Load Error | 23 | White |
| 08/29/03 | M. Panozzo | Letter of reprimand | Unsafe on forklift | 44 | White |
| 09/13/01 | M. Panozzo | Suspension | Error loading forklift | 44 | White |
| 01/29/02 | Johnson | Suspension | Product mix error | 49 | White |
| 12/17/01 | Johnson | Letter of Reprimand | Product mix error | 49 | White |
| 08/24/99 | Sanders | Suspension | Unsafe work practices | N/A | White |
| 06/15/04 | Pratscher | Error on file | Loading error | 47 | White |
| 03/23/05 | Pratscher | Coached | Not following loading procedures | 47 | White |

Based on the aforementioned investigation report, the Department of Human Rights recommended that counts A and B of Owens' charge be dismissed.

With respect to counts C, D, and E, wherein Owens alleged that on February 15, 2005, Koziol issued him a second written reprimand based upon his age, race and in retaliation for his filing of the instant charge, the Department's investigator reported the following evidence. During his interview with the Department investigator, Owens stated that Koziol issued him a written reprimand "for his performance and for a loading error," informing Owens that he had failed to include a number of drums in an order. Owens averred that he could not be certain whether he failed to include those drums in the customer order or whether the customer made

11

changes to the order after he had already loaded it.

On the other hand, Koziol denied Owens' claim that he had been issued this second written reprimand as a result of his age or race or in retaliation for his filing the instant discrimination charge. In fact, Koziol averred that he was not even aware that Owens had filed a discrimination charge against Exxon Mobil. Rather, Koziol told the investigator that he issued Owens a "written warning" for his poor performance. Koziol explained that after Owens loaded an order for a customer on January 7, 2005, that customer contacted Exxon Mobil and indicated that it had not received any of the eight drums it had ordered. According to Koziol, after the warehouse supervisor counted the drums in the warehouse, he discovered that the warehouse had eight additional drums, which verified that Owens, who was the warehouse operator that day, had failed to ship them to the customer.

According to the Department's investigator, Koziol's statement was corroborated by a letter from Koziol to Owens dated February 15, 2005, in which Koziol informed Owens that he was being issued a "letter of reprimand" as a "disciplinary measure" for his "failure to perform [his] job duties." That letter states that Owens' lack of attention to his assigned job task resulted in "customer services failures" and "monetary loss" to Exxon Mobil. The letter specifically notes that Owens was being reprimanded because in filling a customer order on January 7, 2005, he failed to put eight drums of "Telura 622" in that order. The letter also notes that Owens has previously received a record for "counseling," on June 25, 2004, for doing a product conversion that converted inventory to an incorrect product name, and subsequently on January 25, 2004, for multiple loading errors on four different customer orders. The letter further states that in the past

year, Koziol had attempted to coach Owens on several occasions regarding his work performance, lack of productivity, poor loading technique, loading errors and unsafe practices. The letter further advised Owens:

> "It is your responsibility to follow supervisor instruction, safe work practices and job procedures, as well as completing assignments in a timely order. Failure to meet these requirements will result in further disciplinary action, up to and including termination of your employment from [Exxon Mobil.]"

Based on the foregoing investigation report, the Department of Human Rights recommended that counts C, D, and E of Owens' charge be dismissed.

With respect to counts F, G, and H, wherein Owens alleged that on or about April 12, 2005, he was denied equal terms and conditions of employment when Koziol failed to honor his request for tuition reimbursement for several classes, later determined to be air conditioning, heating and ventilation classes, he had taken at a local community college, the Department's investigator reported the following facts. Owens stated that after he submitted his request to Exxon Mobil for reimbursement of his tuition on January 27, 2005, he was denied that request without any written explanation, while, he believes, other similarly situated employees, including Wright and Wantroba, were granted similar requests. Owens admitted that he does not know for certain whether Wright and Wantroba were in fact reimbursed.

When questioned about this incident by the Department investigator, Koziol admitted that Owens requested and was denied tuition reimbursement, but he stated that the reason was nondiscriminatory. Koziol explained that Owens was denied reimbursement because his

13

application did not meet Exxon Mobil's tuition reimbursement policy, which requires that an employee be preapproved for tuition reimbursement before taking the classes. According to Koziol, Owens submitted a request for tuition reimbursement after already having taken the classes.

According to the Department's investigator, Koziol's statements were corroborated by the receipts for those classes submitted by Owens to Exxon Mobil, which reveal that the classes were taken over a year before Owens filed his request for reimbursement. They were also corroborated by Exxon Mobil's written tuition reimbursement policy. Under that policy Exxon Mobil promised to "reimburse employees for actual cost for registration, tuition, regular instruction fees and required textbooks," if the employees qualified for reimbursement. To qualify for reimbursement, the courses taken must have been "designed to maintain or improve the employee's job skills and increase work related competencies or capabilities," and must have been taken at an "accredited university, college or vocational institution for a grade." Most importantly, the policy mandated that "management *** approve the employee's application for a specific course of study and the educational institution *before* each enrollment." (Emphasis added.)

Koziol also stated that contrary to Owens' allegations, Wright and Wantroba were not reimbursed tuition for classes they had taken. In fact, Koziol stated that Exxon Mobil has not reimbursed anyone for tuition expenses at the plant in the past three years. Wright and Wantroba corroborated Koziol's statements. While Wright indicated that he had never requested or received tuition reimbursement from Exxon Mobil, Wantroba stated that although he had

requested reimbursement on one occasion, that reimbursement was not granted because the class Wantroba took did not qualify for tuition reimbursement.

Based on the aforementioned investigation, the Department of Human Rights found that there was insufficient evidence to permit Owens to proceed with counts F, G and H of his discrimination charge. Accordingly, the Department recommended that Owens charge be dismissed in its entirety.

### C. The Chief Legal Counsel's Reversal of the Department's Dismissal

On January 22, 2008, the chief legal counsel of the Department of Human Rights entered an order vacating the Department's dismissal of the charge and remanding the matter to the Department for further investigation. With respect to counts A, B, C, D, and E of the charge, the chief legal counsel directed the Department to determine the following: (1) Exxon Mobil's written discipline policy; (2) the difference between a "written counseling" and a "written warning" and/or "written reprimand"; and (3) specifically, what Exxon Mobil's discipline policy states are the consequences of loading errors.

With respect to counts F, G, and H, the chief legal counsel directed the Department to determine: (1) the date Owens submitted his application for tuition reimbursement; (2) Exxon Mobil's criteria in determining whether courses can be reimbursed; (3) the exact dates Owens' courses started and whether the list of those courses was submitted to Exxon Mobil prior to the tuition reimbursement application process; and (4) the exact date when Owens' request for tuition reimbursement was denied.

### D. The Department's Second Investigation and Dismissal

On July 10, 2008, the Department completed an addendum investigation report, based upon which it again dismissed all counts of Owens' discrimination charge. In conducting its second investigation, the Department investigator reinterviewed Owens and Koziol, as well as reviewed several additional documents provided by the parties, including, *inter alia*: (1) an excerpt from Exxon Mobil's plant rules; (2) a letter from Exxon Mobil to the Department of Human Rights; (3) a group of loading error investigation reports for Owens; and (4) Owens' tuition refund application together with a group of verification for tuition payment forms.

With respect to counts A through E, the Department's addendum investigation report disclosed the following evidence pertinent to the Department's dismissal of those counts. When reinterviewed regarding Exxon Mobil's disciplinary policy, shift supervisor Koziol stated that both the terms of Owens' employment and any disciplinary actions to be taken against him are governed by the terms of the collective bargaining agreement, as well as the Cicero plant's disciplinary rules.

In a letter to the Department dated February 13, 2008, Exxon Mobil explained the contents of the collective bargaining agreement as well as the Cicero plant's disciplinary rules. According to the bargaining agreement, with respect to discipline, if an "employee alleges his/her discharge was unjust," he or she has 10 working days to file a grievance regarding the discharge. After the employee files a grievance, the company must inform the union within three working days of the reason for a disciplinary suspension or a discharge and if the union feels there was no just cause for the company's action, the case may be processed under the grievance and arbitration procedure. In addition, according to the collective bargaining agreement, the

16

company and the union agree to "abide by all valid and applicable non-discrimination laws." Finally, under the agreement "[t]he company retains all rights of management resulting from the ownership of the plant or pertaining to the operation of the business, except to the extent that such rights are limited by the provisions of this Agreement." According to Exxon Mobil, under the collective bargaining agreement, with respect to discipline, the agreement provides only that if the employee believes a suspension or discharge is without "just cause," that employee can file a grievance, and if the grievance is not resolved, the union can request arbitration. The agreement places no other limitations on management's right to operate the business, which includes the right to set standards for work performance and work place behavior and to administer discipline where employees fail to meet standards of performance and behavior.

In this vein, according to Exxon Mobil, the Cicero Regional Distribution Center management has issued plant disciplinary rules. Those plant rules first state that because "personal discipline and proper standards of conduct are necessary to protect the health and safety of all employees," any employee "who fails to maintain at all times proper standards of conduct or who violates any of the plant rules shall subject [himself or herself] to appropriate disciplinary action up to and including termination of employment." Although the plant rules specify certain standards of conduct, such as procedures for reporting injuries or excusing absences, and the ban on "horseplay," sexual harassment, and the use of cell phones inside the plant, they do not include or elaborate on the disciplinary procedure or consequences resulting from loading errors. The plant rules do, however, end with the following statement:

"These rules are not intended to be all inclusive, the Company may establish additional

17

rules, and supervisors may set up rules deemed necessary by operational requirements. Any employee who fails to maintain, at all times, proper standards of conduct, or who violates any of the [above] rules, may be subjected to disciplinary action, which may include termination."

In its letter to the Department, Exxon Mobil also responded to the chief legal counsel's request that Exxon Mobil explain that the difference between a "written counseling" and a "written warning." According to Exxon Mobil, "the difference between 'counseling' and 'warning' is a universally understood concept in labor relations," under which the "objective of 'counseling' is to change an employee's behavior," while the "objective of 'warning' is discipline."

According to Exxon Mobil, "counseling" or "coaching" an employee on his performance is not a disciplinary action. A "counseling" may or may not be reported in the employee's personnel file. Often it consists merely of informal discussions between supervisor and employee wherein "the employee is advised that certain behavior does not meet the employer's standards and that specified remedial actions are needed." Since most employees respond favorably to informal "counseling" and are fully capable of avoiding or correcting their errors, "verbal counseling" is generally not considered discipline. However, should "verbal counseling" prove ineffective, a formal counseling (*i.e.*, "written counseling") session may follow. When a written memo detailing a "counseling" session is placed in an employee's personnel file, it is intended to provide the employee with "fair notice of the employer's specific requirements," as well as to lend "formality to the session, thereby increasing its significance to the employee."

18

On the other hand, according to Exxon Mobil, a "letter of reprimand" or a "written warning," is a "disciplinary document that informs the employee that he has failed to make the necessary improvements in performance or behavior and that if he continues to perform unsatisfactorily he may be subject to more severe discipline, up to and including discharge."

According to Exxon Mobil's letter to the Department, on December 13, 2004, Owens was given a "written reprimand" because he had accumulated three prior loading errors for poor performance.[3] In support of this contention, Exxon Mobil provided the Department with a copy

---

[3]We note that the record is somewhat unclear as to what type of document Owens was issued on December 13, 2004. While Owens alleged that he was given a "written reprimand," both shift supervisor Koziol and operations manager O'Reilly initially told the Department's investigator that Owens was merely issued a "written counseling." The record also reveals that in its initial response to the Department's investigator Exxon Mobil explained that while Owens was given a "written reprimand" on December 13, 2004, that reprimand was later reduced to a "written counseling" after Owens filed a grievance with Exxon Mobil and prior to his filing of the instant discrimination charge with the Department of Human Rights. However, during the Department's second investigation, in a letter to the Department, Exxon Mobil apparently conceded that Owens was given a "written reprimand" on December 13, 2004. In that vein, during this second investigation, shift supervisor Koziol changed his prior statement to the Department's investigator now admitting that Owens was in fact given a "written reprimand," and not a "written counseling." Since the Department's investigator, the chief legal counsel and both parties on appeal seem to agree that on December 13, 2004, Owens was a "written

19

of several documents related to these three loading error investigation reports, dated November 1, 2004, October 12, 2004, and December 7, 2004. Those documents revealed that Owens first received "verbal counseling" for a loading error on June 25, 2004, as a result of his failure to add a pallet onto his loading truck and as a result of his inability to fill the order in the requisite amount of time. Owens next received "verbal counseling" in October, after his failure to fill a customer order dated October 7, 2004. That order requested five cases of "Mobil Grease CM-S," but the customer received none. The reports further revealed that Owens received another "verbal coaching session" in November as a result of his failure to properly load a customer order dated October 29, 2004. Although in that order the customer requested 1,092 cases of "Mobil 1 5W30," it received only 936 of those cases.

As a result of these three prior loading errors, which were followed by "verbal counseling" sessions, Owens was given a "written reprimand" on December 13, 2004, after a customer complained regarding an order he loaded on August 5, 2004. While that customer order requested 26 cases of "Mobil 1" products, 11 pails of "Mobilux EP2," 5 pails of "Mobil ShC 632" and 4 pails of Vacuoline, the customer received 25 cases of "Mobil 1" products; 12 pails of "Mobilux EP2," 4 pails of "Mobil ShC 632," 3 pails of Vacuoline; and 1 pail of "something without a label."

Based upon the aforementioned additional evidence, as well as the information gathered during its initial investigation, the Department found that Owens had not presented substantial

reprimand," we have no reason to deviate from this conclusion and therefore treat the "written reprimand" as such.

evidence so as to support the allegations in counts A through E of his charge.

With respect to counts F, G, and H, wherein Owens alleged he had been denied equal terms and conditions of employment when Exxon Mobil refused to grant him tuition reimbursement on the basis of his race, age and in retaliation for his filing of the instant charge, the Department's addendum investigation report revealed the following additional evidence. Upon being reinterviewed, Owens stated that in 2005 he submitted his paperwork requesting to be reimbursed for air conditioning, heating and ventilation classes that he completed in 2002, 2003, and 2004.[4] Owens stated that he did not request tuition reimbursement on those classes earlier because prior to taking them he was told that he would not be reimbursed, since those classes were not related to his job duties as a forklift driver. Owens explained, however, that he took the classes anyway, paying for them out of pocket because in the future, he planned to bid on a maintenance position at the plant. That position involved work with boilers.

Upon being reinterviewed, shift supervisor Koziol stated that Exxon Mobil does not keep a record of denied requests for tuition reimbursement and does not have a record of the specific date on which Owens requested reimbursement. Koziol reiterated that the reason for the denial of Owens tuition reimbursement request was nondiscriminatory. According to Koziol, Owens was denied reimbursement because the courses were not preapproved and because they did not meet the criteria of the program, *i.e.*, they were unrelated to his Owens' job duties.

---

[4]A group of verification for tuition payment forms along with an educational refund application for approval form for Owens indicates that Owens took classes during the years 2002 through 2004, which totaled $3,352.

Based upon the foregoing, the Department dismissed counts F, G, and H of Owens' charge. Owens subsequently filed a request for review by the chief legal counsel of the Department.

### E. The Chief Legal Counsel Affirms the Dismissal

On March 9, 2009, the chief legal counsel entered an order sustaining the dismissal of all eight counts of Owens' charge for lack of substantial evidence supporting claims of discrimination. With respect to counts A and B, wherein Owens alleged that on December 13, 2004, he received a written reprimand on the basis of his race and age, the chief legal counsel first found that such a "written reprimand" did not constitute an adverse employment action, since Owens did and could not allege that this reprimand somehow "detrimentally affected" his employment, such as through "loss of pay, loss of benefits, suspension, discharge etc." Citing to Mattern v. Eastern Kodak Co., 104 F.3d 702 (5th Cir. 1997), the chief legal counsel therefore found that a claim of discrimination based upon the December 13, 2004, written reprimand was not actionable under the Illinois Human Rights Act.

The chief legal counsel next found that even if this written reprimand could somehow constitute an adverse employment action, the investigation failed to reveal substantial evidence of a nexus between the written reprimand and Owens' age/and or race. Rather, according to the chief legal counsel, the Department's investigation established that Owens had a history of performance problems related to loading errors prior to December 13, 2004, and that he was issued the written reprimand as a result of this history of poor performance. In addition, the chief legal counsel noted that contrary to Owens' allegations the Department's investigation disclosed

22

that Exxon Mobil issued discipline to other employees for their poor performance. Among those employees disciplined, the chief legal counsel noted: Hanson (white, 44), who received coaching for loading errors; Panozzo (white, 26), who was coached and then suspended for loading errors; Wright (white, 23), who was given a written error report in his personnel file for loading errors; Johnson (white, 49), who was given a written warning and then suspended for product mix errors; and Pratscher (white, 47), who was coached for not following loading procedures.

The chief legal counsel similarly found with respect to counts C, D, and E, that Owens had failed to provide substantial evidence that he was issued the second written reprimand on February 15, 2005, because of his race or age or in retaliation for filing the instant charge. Rather, the Department's investigation revealed that on or about January 7, 2005, Owens loaded an order, the customer reported that it did not receive the complete order and Exxon Mobil issued Owens the written reprimand for this error. Referring to its rationale with respect to counts A and B, the chief legal counsel reiterated that the Department's investigation disclosed that Exxon Mobil similarly disciplined several warehouse operators not in Owens' protected age and/or race classes.

Finally, with respect to counts F, G, and H, the chief legal counsel found that the investigation did not reveal substantial evidence that Exxon Mobil subjected Owens to unequal terms and conditions of employment because of his age, race or in retaliation for filing the subject charge when it refused to refund his tuition. Specifically, the chief counsel noted that the tuition policy clearly states that management must approve the tuition reimbursement prior to each enrollment in a class.

23

No. 1-09-0908

Owens now appeals, contending that the chief legal counsel's decision to sustain the dismissal of his charge constituted an abuse of discretion.


II. ANALYSIS

We begin by noting the well-established principles regarding discrimination charges brought under the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq*. (West 2004)). This Act prohibits "unlawful discrimination," *i.e.*, discrimination against a person on the basis of, *inter alia,* his or her race, color, religion, national origin, ancestry, age, sex, marital status, or handicap. 775 ILCS 5/1-102 (West 2004). The Act specifically defines the following conduct as a civil rights violation in the employment context:

> "For any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination ***." 775 ILCS 5/2-102(A) (West 2004).

The Act also defines retaliation as a civil rights violation, noting:

> "It is a civil rights violation for a person, or for two or more persons to conspire, to:
>
> *** Retaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination, sexual harassment in employment or sexual harassment in higher education, discrimination based on

24

citizenship status in employment, or because he or she has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this Act[.]"  775 ILCS 5/6-101(A) (West 2004).

When an employee files a discrimination charge against the employer pursuant to the Illinois Human Rights Act with the Department of Human Rights, the Department must conduct a full investigation of the allegations set forth in the charge and provide a written report of such an investigation.  775 ILCS 5/7A-102(C)(1), (D)(1) (West 2004).  After reviewing the investigation report, the Department must determine whether there is substantial evidence that the alleged civil rights violation has been committed. 775 ILCS 5/7A-102(D)(2) (West 2004). Under the Act, substantial evidence is defined as evidence "which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance."  775 ILCS 5/7A-102(D)(2) (West 2004).  If the Department of Human Rights determines that there is no substantial evidence, the charge is dismissed.  775 ILCS 5/7A-102(D)(2)(a) (West 2004).  If the charge is dismissed by the Department of Human Rights, petitioner may seek review by filing a request for review with the chief legal counsel of the Department.  775 ILCS 5/7A-102(D)(2)(a) (West 2004).

The chief legal counsel's order reviewing the dismissal is a final and appealable order (775 ILCS 5/7A-102(D)(2)(a) (West 2004)), and petitioner may seek review of the chief legal counsel's order in the appellate court (775 ILCS 5/8-111(A)(1) (West 2004)).  The standard of review on appeal is whether the Department's chief legal counsel abused his discretion. Anderson v. Chief Legal Counsel, 334 Ill. App. 3d 630, 634 (2002); see also Welch v. Hoeh, 314

Ill. App. 3d 1027, 1034 (2000) ("we may not reweigh the evidence or substitute our judgment for that of the Department. [Citation.] Our review is limited to deciding whether the chief legal counsel's *** decision dismissing the claim *** is 'arbitrary and capricious or an abuse of discretion.' [Citation.]").  A decision is arbitrary and capricious only if it "contravenes the legislature's intent, fails to consider a crucial aspect of the problem, or offers an impossible explanation contrary to agency expertise." Allen v. Lieberman, 359 Ill. App. 3d 1170, 1177 (2005); see also Deen v. Lustig, 337 Ill. App. 3d 294, 302 (2003), quoting LaSalle National Bank v. City Suites, Inc., 325 Ill. App. 3d 780, 786 (2001), and citing Bodine Electric of Champaign, v. City of Champaign, 305 Ill. App. 3d 431, 435 (1999) ("[a]n abuse of discretion is found when a decision is reached without employing conscientious judgment or when the decision is clearly against logic").

Turning to the merits of the cause at bar, we initially note that on appeal Owens does not challenge the dismissal of counts E through H of his discrimination charge.  Owens only argues that the chief legal counsel abused his discretion in finding that there was no substantial evidence to support his claims of age and race discrimination based on the December 13, 2004, and February15, 2005, written reprimands (counts A, B, C, and D).

Since Owens does not argue that the chief legal counsel erred in finding that there was a lack of substantial evidence to support the claim that he was issued the February 15, 2005 reprimand in retaliation for filing the subject charge (count E) or the claim that Exxon Mobil subsequently refused to grant his tuition reimbursement request because of his race or age or in retaliation for filing the subject charge (counts F, G, H), he has forfeited his right to challenge the

dismissal of counts E through H. See 210 Ill. 2d R. 341(h)(7) ("Points not argued [in the opening appellant's brief] are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"); see also In re K.T., 361 Ill. App. 3d 187, 206 (2005) (holding that arguments not raised in appellant's brief are forfeited); see also City of Grantie City v. House of Prayers, Inc., 333 Ill. App. 3d 452, 462 (2002) (holding that "a court of review is entitled to have the issues clearly defined with pertinent authority cited," and "is not simply a depository in which an appealing party may dump the burden of argument and research"). Therefore, by reason of such forfeiture, any contention that by the denial of tuition reimbursement Exxon Mobil somehow subjected Owens to unequal terms and conditions of employment can play no further part in this appeal.

Accordingly, we turn to the Department's dismissal of counts A through D of Owens' charge. Owens first contends that the chief legal counsel erred in sustaining the Department's dismissal of counts A and B of his discrimination charge, wherein he alleged that shift supervisor Koziol issued him a written warning on December 13, 2004, on the basis of his age and race. Owens specifically argues that the chief legal counsel erred when it found that: (1) Exxon Mobil's written reprimand to him issued on December 13, 2004, did not constitute a cognizable adverse employment action and (2) that Owens failed to present substantial evidence that other similarly situated younger and white workers were treated differently. For the reasons that follow, we disagree.

We first note that in Zaderaka v. Illinois Human Rights Comm'n, 131 Ill. 2d 172, 178-79 (1989), our supreme court recognized that in evaluating charges of discriminatory practices

brought under the Illinois Human Rights Act (now see 775 ILCS 5/2-102(A) (West 2004)), the

Department of Human Rights and the Illinois appellate courts have adopted the three-part test

employed by the federal courts in actions for employment discrimination brought under title VII

of the Civil Rights Act of 1964 (42 U.S.C. §2000e *et seq*. (1982)) and the Age Discrimination in

Employment Act of 1967 (AEDA) (29 U.S.C. §621 *et seq.* (1982)), as articulated by the United

States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d

668, 677, 93 S. Ct. 1817, 1824 (1973).

Under this three-prong test, the petitioner must first establish by a preponderance of the

evidence a *prima facie* case of unlawful discrimination. Zaderaka, 131 Ill. 2d at 179-80. If *a*

*prima facie* case is established, a rebuttable presumption arises that the employer unlawfully

discriminated against the plaintiff. Zaderaka, 131 Ill. 2d at 178-79. Second, to rebut the

presumption, the employer must articulate, not prove, a legitimate, nondiscriminatory reason for

its decision. Zaderaka, 131 Ill. 2d at 179. Third, if the employer articulates such a reason, the

plaintiff must prove, again by a preponderance of the evidence, that the employer's reason was

untrue and was a pretext for discrimination. Zaderaka, 131 Ill. 2d at 179. Under this test, the

ultimate burden of persuasion remains on the plaintiff throughout the proceedings. Zaderaka,

131 Ill. 2d at 179.

To establish a *prima facie* case of employment discrimination, the petitioner must first

show that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate

business expectations; (3) he suffered an adverse employment action; and (4) the employer

treated similarly situated employees outside the class more favorably. Owens v. Department of

Human Rights, 356 Ill. App. 3d 46, 52 (2005).

To show that he suffered an adverse employment action, an employee must establish that the employment action was "materially adverse" and not a " ' "mere inconvenience or an alteration of job responsibilities." ' " Hoffelte v. Department of Human Rights., 367 Ill. App. 3d 628, 633 (2006), quoting Traylor v. Brown, 295 F.3d 783, 788 (7th Cir. 2002), quoting Rabinovitz v. Pena, 89 F.3d 482, 488 (7th Cir. 1996). A materially adverse employment action is "one that significantly alters the terms and conditions of the employee's job." Griffin v. Potter, 356 F.3d 824, 829 (7th Cir. 2004); see also Rhodes v. Illinois Department of Transportation, 359 F.3d 498, 504 (7th Cir. 2004) ("an adverse employment action is a significant change in the claimant's employment status"); Johnson v. Cambridge Industries, Inc., 325 F. 3d 829, 901, 902 (7th Cir. 2003) (noting that to establish an adverse employment action an employee "must show some quantitative or qualitative change in the terms or conditions of his employment" or some sort of "real harm"). Adverse employment actions include things such as hiring, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits. See Rhodes, 359 F.3d at 504; see also Hoffelte, 367 Ill. App.3d at 633, quoting Traylor, 295 F.3d at 788 (" ' "[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation" ' [Citation]"). However, "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that 'an *** employee did

29

not like would form the basis of a discrimination suit.' " Smart v. Ball State University, 89 F.3d 473, 441 (7th Cir. 1996), quoting Williams v. Bristol-Meyers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1993).

Accordingly, it has repeatedly been held that oral and written reprimands alone do not alter an employee's terms or conditions of employment to such an extent so as to constitute an adverse employment action for purposes of establishing a *prima facie* case of employment discrimination. See, *e.g.*, Lloyd v. Swifty Transportation , Inc., 552 F.3d 594, 602 (7th Cir. 2009) ("written reprimands without any changes in the terms and conditions of *** employment are not adverse employment actions"); see also Atanus v. Perry, 520 F.3d 662, 675 (7th Cir. 2008) (holding that "letter or instruction" which admonished the employee that she was not following guidelines did not rise to the level of adverse employment action where the employee did not show any job consequences such as termination, demotion, or change in responsibilities); see also Oest v. Illinois Department of Corrections, 240 F.3d 605, 613 (7th Cir. 2001) (holding that oral and written reprimands received under progressive discipline system did not constitute adverse employment action where they did not implicate any tangible job consequences); Grube v. Lau Industries, Inc., 257 F.3d 723, 729 (7th Cir. 2001) ("unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions"); Krause v. City of La Crosse, 246 F.3d 995, 1000 (7th Cir. 2001) (same); Sweeney v. West, 149 F.3d 550, 556-57 (7th Cir. 1998) (holding that "two counseling statements" which admonished the employee to improve did not constitute adverse employment action since employee failed to point to any immediate consequences of the reprimands, such as

30

change in an eligibility for promotion, denial of advantageous increase in responsibilities or similar benefits); *cf.*, Coolidge v. Consolidated City of Indianapolis, 505 F.3d 731, 735 (7th Cir. 2007) (explaining that two reprimands followed by termination constituted an employment action).

In the present case, Owens nowhere alleged and the Department's investigation nowhere revealed any evidence suggesting that the December 13, 2004, "written reprimand" had any significant effect on the terms or conditions of his employment, so as to constitute an adverse employment action. In its letter to the Department, Exxon Mobil explained that a written reprimand is a disciplinary document that merely tells an employee that he has failed to make the necessary improvements in performance or behavior and that if he continues to perform unsatisfactorily he may be subject to more severe discipline, up to and including discharge. Consistent with this assertion, the December 13, 2004, written reprimand served only to warn Owens about his unsatisfactory work performance. In this respect, in his own discrimination charge, Owens asserted only that he was issued the reprimand for "working too slowly and for making excessive errors." Shift supervisor Koziol similarly stated that he issued the written reprimand to Owens because of his poor performance. Accordingly, there was no evidence that the written reprimand had any significant effect on the terms and conditions of Owens' job, such as the amount of his pay, his benefits or his work responsibilities. Therefore, Owens failed in his burden to establish that the written reprimand constituted an adverse employment action. See, *e.g.*, Lloyd, 552 F.3d at 602 (holding that a loading driver who received two written reprimands for loading gas from the wrong supplier failed to establish a *prima facie* case of employment

31

discrimination since "written reprimands without any changes in the terms and conditions of his employment are not adverse employment actions"); see also Atanus, 520 F.3d at 675 (holding that employee had failed to establish that a "letter or instruction" which admonished her that she was not following company guidelines constituted an adverse employment action where the employee did not show that the letter was followed by any significant consequences to her employment, such as termination, demotion, or change in responsibilities): see also Sweeney, 149 F.3d at 556-57 (holding that employee failed to establish that "two counseling statements" which admonished him to improve constituted an adverse employment action since employee failed to point to any immediate consequences of the reprimands, such as change in an eligibility for promotion, denial of advantageous increase in responsibilities or similar benefits).

Owens nevertheless argues on appeal that in finding that the written reprimand did not constitute an adverse employment action, the chief legal counsel erroneously relied on Mattern v. Eastern Kodak Co., 104 F.3d 702 (5th Cir. 1997). Owens argues that while in Mattern, the Fifth Circuit held that only "ultimate employment decisions" are actionable adverse acts, the United States Supreme Court invalidated that ruling in Burlington Northern & Santa Fe R.y. Co. v. White, 548 U.S. 53, 165 L. Ed. 2d 345, 126 S. Ct. 2405 (2006). Owens, however, misunderstands both the chief legal counsel's decision as well as the decision in Burlington Northern.

First, contrary to Owens' assertion, the chief legal counsel did not cite Mattern for the proposition that only "ultimate employment decisions" are to be considered actionable adverse acts for purposes of discrimination claims. Rather, the chief legal counsel relied on Mattern for

the principle that to constitute an adverse employment action, the employer's action must have somehow "detrimentally affected" the employee. The chief legal counsel then found that the Department's investigation disclosed no evidence that the December 13, 2004, written reprimand somehow detrimentally affected Owens, such as by way of "loss of pay, loss of benefits, suspension, discharge, etc." Based on the aforementioned, the chief legal counsel found that Owens had failed to present a *prima facie* case of an actionable adverse employment action.

Moreover, Owens' citation to <u>Burlington Northern</u> is entirely misplaced. In that case, the United States Supreme Court held that claims of retaliation are not limited to actions that affect the employee's terms and conditions of employment. <u>Burlington Northern</u>**,** 548 U.S. at 63-67, 165 L. Ed. 2d at 357-59, 126 S. Ct. at 2412-15. In doing so, however, the Supreme Court expressly distinguished claims of substantive employment discrimination, such as the one here, from claims of retaliation, explaining that substantive discrimination claims *are* limited to actions that affect the employee's terms and conditions of employment. <u>Burlington Northern</u>**,** 548 U.S. at 64-67, 165 L. Ed. 2d at 357-59, 126 S. Ct. at 2412-15. As the Court in Burlington Northern explained:

> "The antidiscrimination provision seeks a workplace where individuals are not
> discriminated against because of their racial, ethnic, religious, or gender-based status.
> See <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 800-801, [36 L. Ed.2d 668, 93 S.
> Ct. 18117] (1973). The antiretaliation provision seeks to secure that primary objective by
> preventing an employer from interfering (through retaliation) with an employee's efforts
> to secure or advance enforcement of the Act's basic guarantees. The substantive

33

provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct.

To secure the first objective, Congress did not need to prohibit anything other than employment-related discrimination. The substantive provision's basic objective of 'equality of employment opportunities' and the elimination of practices that tend to bring about 'stratified job environments,' [citation] would be achieved were all employment-related discrimination miraculously eliminated.

But one cannot secure the second objective by focusing only upon employer actions and harm that concern employment and the workplace. Were all such actions and harms eliminated, the antiretaliation provision's objective would not be achieved. An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." (Emphasis omitted.) Burlington Northern, 548 U.S. at 63, 165 L. Ed. 2d at 356-57, 126 S. Ct. at 2412.

Accordingly, Owens' citation to Burlington Northern in support of his substantive discrimination claim is without merit.

In any event, even if we were to hold that the December 13, 2004, written reprimand was an adverse employment action, a review of the record below reveals that contrary to Owens' contention, the chief legal counsel did not abuse his discretion in finding that this reprimand was

34

not related to Owens race or age.

In that respect, we note that the record below reveals that Exxon Mobil issued Owens the written reprimand in accordance with Exxon Mobil's disciplinary policies because Owens had accumulated a history of loading errors. The Department's investigation report revealed that Exxon Mobil's plant rules provide that an employee who fails to maintain proper standards of conduct or who violates any of the plant rules will be subject to appropriate discipline up to and including termination. The rules further state that supervisors may establish additional rules deemed necessary by operational requirements.

The Department's investigation further revealed that prior to the December 13, 2004, Owens had accumulated a history of performance problems related to loading. The Department's investigation disclosed that Exxon Mobil received and investigated several complaints on orders loaded by Owens beginning in June 2004. Specifically the investigation revealed that Owens first received "verbal counseling" for a loading error on June 25, 2004, as a result of his failure to add a pallet onto his loading truck and as a result of his inability to fill the order in the requisite amount of time. Owens next received a "verbal counseling" session in October 2004, after his failure to fill a customer order dated October 7, 2004. That order requested five cases of "Mobil Grease CM-S," but the customer received none. Owens received another verbal coaching session in November 2004 as a result of his failure to properly load a customer order dated October 29, 2004. Although in that order, the customer requested 1,092 cases of "Mobil 1 5W30," it received only 936 of those cases. Following these three loading errors, Owens was issued the written reprimand on December 13, 2004, after an investigation

35

into a customer's complaint regarding an order dated August 5, 2004, revealed that Owens had failed to properly load that order. While that customer order requested 26 cases of "Mobil 1" products, 11 pails of "Mobilux EP2," 5 pails of "Mobil ShC 632" and 4 pails of Vacuoline, the customer received 25 cases of "Mobil 1" products, 12 pails of "Mobilux EP2," 4 pails of "Mobil ShC 632," 3 pails of Vacuoline, and 1 pail of "something without a label." Accordingly, the December 13, 2004, written reprimand was intended to warn Owens that he had failed to make the necessary improvements in his performance and that if he continued to perform unsatisfactorily he could be subject to more severe discipline.

Moreover, the Department's investigation disclosed no evidence at all that similarly situated employees outside Owens' protected class were not similarly disciplined for similar conduct. In fact, Exxon Mobil's disciplinary records for the employees at the Cicero plant revealed that Exxon Mobil issued written reprimands, "counseling," and even suspensions to younger, white employees in the plant for their poor work performance. For example, on August 29, 2003, Panozzo (white, 26 years old) received a letter of reprimand for operating a forklift truck in an unsafe manner on company property. Similarly, on August 29, 2003, Wantroba (white, 36) was suspended for truck spillage, and on August 28, 2003, Novakowksi (white, 47) received "counseling" for failure to wear proper attire at the plant.

More importantly, Exxon Mobil's loading error investigation reports disclosed that other employees were disciplined for their poor performance in loading orders. For example, those reports showed that in 2004 and 2005 both Hansen (white, 44 years old) and Panozzo (white, 26 years old) were "coached" for loading errors. Similarly, in 2004 both Wright (white, 23 years

old) and Pratscher (white, 47 years old) were given errors in their personnel files for loading errors. In 2005, Pratscher was subsequently coached for not following loading procedures. In addition, the reports reveals that both Panozzo and Johnson (white, 49 years old) received letters of reprimand in 2003 and 2001, respectively, the first for unsafe use of a forklift and the latter for a product mix error in loading. Both Panozzo and Johnson were also suspended for poor performance (Johnson in 2002 for a product mix error, and Panozzo in 2001 for an error loading the forklift). Accordingly, Owens cannot contend that other, younger and white employees escaped discipline at the plant.

Owens nevertheless argues that he presented sufficient evidence of race- and age-based discrimination because the reports from Exxon Mobil reveal that while younger white employees were disciplined, unlike him, they were not given letters of reprimand for loading errors. Owens specifically points out that Pratscher, Hanson and Panozzo only received coaching for their loading errors, and Wright only had an error reported in his file for a loading error. For the reasons that follow, we find this argument without merit.

We first note that when interviewed by the Department's investigator, operations manager O'Reilly explained that an employee would receive a "written counseling" followed by a "written reprimand" or written warning only after he or she accumulated more than three loading errors. In that respect O'Reilly stated that, contrary to Owens' contention, Wright was only given a loading error in his file, instead of a "counseling" or a warning, because prior to that he had made no loading errors. O'Reilly also explained that Pratscher and Panozzo had not been counseled or given written warnings with respect to loading errors since neither had committed

three such errors.

More importantly, Owens himself fails to allege that anyone of the aforementioned employees was in fact similarly situated to him. As explained above, the record demonstrates that Owens had a history of loading errors and had received "verbal counseling" and "coaching" for these errors before his December 13, 2004, "written reprimand." However, in arguing that the other employees did not receive "written reprimands," Owens does not show or even allege that they had a similar history concerning loading errors.

Accordingly, under the record below, it is apparent that the chief legal counsel did not abuse his discretion in finding that there was a lack of substantial evidence showing that Exxon Mobil issued Owens the December 13, 2004, reprimand on the basis of his age or his race.

Owens next contends that the chief legal counsel erred in sustaining the Department's dismissal of counts C and D of his discrimination charge because there was substantial evidence that shift supervisor Koziol issued him a second "written reprimand" on February 15, 2005, on the basis of his age and race. We disagree.

We initially note that for those same reasons already articulated above in the context of the December 13, 2004, "written reprimand," Owens has failed to show that the February 15, 2004, "written reprimand" standing alone sufficiently affected the terms and conditions of his employment so as to constitute an adverse employment action. As with the December 13, 2004, reprimand, here again, Owens presented no evidence to show that the second written reprimand had any significant effect on the terms and conditions of his employment, such as his pay,

benefits or work responsibility. See, *e.g.*, Lloyd, 552 F.3d at 602; Atanus, 520 F.3d at 675; Sweeney, 149 F.3d at 556-57.

More overridingly, even if the second "written reprimand" constituted an adverse employment action, a review of the record below reveals that the chief legal counsel did not abuse his discretion in finding that there was no evidence that the decision to issue the reprimand was not related to Owens' race or age. In fact, the Department's investigation revealed that Owens was issued the February 15, 2005, reprimand after committing a loading error on January 7, 2005, by failing to load any of the eight drums of "Telura 622" requested by the customer and as a result of having committed numerous loading errors in the past. The customer order dated January 7, 2005, showed that the customer did in fact order eight drums of "Telura 622." Shift supervisor Koziol told the Department investigator that after receiving and investigating the customer's complaint, the warehouse supervisor found that its inventory was over by eight drums and that Owens was the warehouse operator in charge of loading that order. More importantly, Owens himself never denied making the error, but simply stated that he did not know whether he failed to include the drum in the order, explaining that the customer could have changed the order after he loaded it.

In addition, the Department's investigation revealed no evidence that similarly situated employees outside of Owens' protected class were not similarly disciplined for similar conduct. As already articulated above, Exxon Mobil issued "written reprimands," "counseling," and suspensions to numerous other employees for poor work performance. Accordingly, for all of the aforementioned reasons, we find no abuse of discretion in the chief legal counsel's dismissal

of counts C and D of Owens' discrimination charge.        On appeal, Owens next contends that the substantial evidence standard as articulated under section 7A-102(D)(2) of the Illinois Human Rights Act (775 ILCS 5/7A-102(D)(2) (West 2004)) violates the requirements of due process because it is unconstitutionally vague. Although not clearly explained in his brief, Owens appears to argue that the statute is unconstitutional on its face as well as applied to him because under the Act's definition of "substantial evidence," a petitioner does not know what level of proof is necessary to sustain a charge of discrimination, and because it gives the chief legal counsel unbridled discretion. For the reasons that follow, we disagree.

At the outset, we note that Owens has waived his right to raise this issue on appeal by failing to raise it in the administrative proceedings below. In that respect, we note that "[i]n general, issues or defenses not placed before the administrative agency will not be considered for the first time on administrative review." Texaco-Cities Service Pipeline Co. v. McGaw, 182 Ill. 2d 262, 278-79 (1998). Our supreme court has held that this general waiver principle applies to constitutional challenges to a statute not raised before an administrative agency, unless the issue being raised for the first time on appeal is a facial challenge to the statute. See Texaco-Cites Service Pipeline Co., 182 Ill. 2d at 278-79, Carpetland U.S.A., Inc. v. Illinois Department of Employment Security, 201 Ill. 2d 351, 396-97 (2002); cf., Arvia v. Madigan, 209 Ill. 2d 520, 527-28 (2004) ("A principal reason underlying this court's preference that litigants assert a constitutional challenge before the agency-notwithstanding the agency's inability to rule on the matter–is that it allows opposing parties a full opportunity to present evidence to refute the constitutional challenge. Such an evidentiary record is indispensable because administrative

review is confined to the record created before the agency. [Citation.] A facial challenge to a statute, however, presents an entirely legal question that does not require fact-finding by the agency or application of the agency's particular expertise").

With respect to a vagueness challenge to a statute, our supreme court has made clear that a petitioner will have standing to challenge the constitutionality of a statute on its face only if the challenged language implicates first amendment rights. See People v. Jihan, 127 Ill. 2d 379, 385-86 (1989); see also People v. Ryan, 117 Ill. 2d 28, 34, (1987), quoting United States v. Mazurie, 419 U.S. 544, 550, 42 L. Ed. 2d 706, 713, 95 S. Ct. 710, 714 (1975). Since here, Owens does not allege nor could he that the "substantial evidence" standard as articulated in section 7A-102 of the Illinois Human Rights Act (775 ILCS 5/7A-102(D)(2) (West 2004)) implicates any first amendment concerns, he does not have standing to argue that the Act is facially unconstitutional. See, *e.g.*, Jihan, 127 Ill. 2d at 386 (holding that because no first amendment issue was involved with respect to the constitutionality of the now repealed medical practice act provisions making it a crime to practice midwifery without a license, defendant did not have standing to argue that the statute might be vague as applied to someone else). Accordingly, since Owens has no standing to make a facial challenge to the statute, and since he has failed to argue before the Department that the statute is vague as applied to him, he has waived his right altogether to address the vagueness issue on appeal. See Texaco-Cities Service Pipeline Co., 182 Ill. 2d at 278-79; Carpetland U.S.A., Inc., 201 Ill. 2d at 396-97.

Nevertheless, even if we were to consider the merits of Owens' vagueness contention, for the reasons that follow, we would find that the statute is not unconstitutionally vague, either on

its face or as applied to Owens.

It is well established that there is a strong presumption that a statute is constitutional and that the party challenging its validity will bear the burden of clearly establishing that the statute is unconstitutional. People v. Sharpe, 216 Ill. 2d 481, 486-87 (2005); see also Morgan v. Department of Financial & Professional Regulation, 374 Ill. App. 3d 275, 292 (2007).

A vagueness challenge is a due process challenge focusing on the specificity of the language of a statute. East St. Louis Federation of Teachers v. East St. Louis School District, 178 Ill. 2d 399, 424-26 (1997). A statute is unconstitutionally vague and violates due process if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute or if there is an absence of standards restricting the discretion of governmental authorities who apply the law. East St. Louis Federation of Teachers, 178 Ill. 2d at 424-26. The terms of a statute cannot be " 'so ill-defined that their meaning may be determined at whim rather than by objective criteria.' " East St. Louis Federation of Teachers, 178 Ill. 2d at 425-26, quoting People v. Burpo, 164 Ill. 2d 261, 266 (1995); see also Morgan, 374 Ill. App. 3d at 292-93. Rather, the statute's terms must be explicit enough to serve as a guide to those who must comply with it. East St. Louis Federation of Teachers, 178 Ill. 2d at 425; see also Morgan, 374 Ill. App. 3d at 292-93. However, mathematical certainty in the language is not required. East St. Louis Federation of Teachers, 178 Ill. 2d at 424-25; see also Morgan, 374 Ill. App. 3d at 292-93. Moreover, a statute will not be considered unconstitutionally vague " 'merely because one could imagine hypothetical situations in which the meaning of some terms might be called into question.' " Morgan, 374 Ill. App. 3d at 292, quoting Maun v. Department of Professional

Regulation, 299 Ill. App. 3d 388, 397 (1998).

In the present case, the Act specifically defines "substantial evidence" and Owens has failed to show that this definition was not sufficiently precise to guide the parties or the agency. As already noted above, the Act defines "substantial evidence" as "evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla *but may be somewhat less than a preponderance*." (Emphasis added.) 775 ILCS 5/7A-102(D)(2) (West 2004). Contrary to Owens' assertion that the phrase "may be somewhat less than a preponderance" does not permit a party filing a discrimination charge to know whether his or her claim must be supported by more than a preponderance of the evidence or less than a preponderance of the evidence, the term "may" has clearly been defined as connoting only permission. See Cook County Board of Review v. Property Tax Appeal Board, 334 Ill. App. 3d 56, 59 (2002) ("use of the word 'may' is construed as permissive, not mandatory"); see also New American Webster Dictionary (1972) (defining "may" as "have the ability to" or "have permission to" or "be free to;" noting that the term is used to indicate probability and possibility). Moreover, those Illinois cases that have addressed the substantial evidence standard have made clear that substantial evidence does not require more than a preponderance of evidence. See, *e.g.*, Stone v. Department of Human Rights, 299 Ill. App. 3d 306, 314-15 (1998) ("Substantial evidence means more than a mere scintilla but less than a preponderance of the evidence. [Citations.] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"); see also Sanders v. United Parcel Service, 142 Ill. App. 3d 362, 364 (1986) (noting that the substantial evidence standard "was deliberately left vague to

43

permit the [Department of Human Rights] some degree of discretion in ascertaining and evaluating the facts"). Accordingly, we find that the substantial evidence standard is not unconstitutionally vague.

Furthermore, Owens has specifically failed to show that the substantial evidence standard is vague as applied to him. Vagueness is an elastic concept, and just because a term is vague to one person, does not necessarily mean that it will be vague to another. See City of Chicago v. Pooh Bah Enterprises, Inc., 224 Ill. 2d 390, 441-42 (2006). Accordingly, where a party raises a vagueness challenge by arguing that a statute is vague as applied, a reviewing court must "evaluate a statute in the context of the specific circumstances in which it was applied to the litigant who contests its validity." Pooh Bah Enterprises., 224 Ill. 2d at 442; see also People v. Ryan, 117 Ill. 2d 28, 34 (1987), quoting United States v. Mazurie, 419 U.S. 544, 550, 42 L. Ed. 2d 706, 713, 95 S. Ct. 710, 714 (1975) (" '[v]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand' "). In the present case, we have already held that the mere issuance of two written reprimands did not constitute an adverse employment action. The sparsity of evidence offered by Owens to support the existence of an adverse employment action is therefore outside the confines of the "substantial evidence standard" so that the term, even if otherwise unclear, would at least have sufficient clarity to denote an amount of evidence in excess of that which was provided by Owens. Accordingly, under these circumstances Owens cannot complain that the Act is vague as applied to him. See Parker v. Levy, 417 U.S. 733, 756, 41 L. Ed. 2d 439, 458, 94 S. Ct. 2547, 2562 (1974) ("[o]ne to whose conduct a statute clearly applies may not successfully

No. 1-09-0908

challenge it for vagueness"); see also Pooh Bah Enterprises, 224 Ill. 2d at 442.

### III.  CONCLUSION

For the foregoing reasons, the order of chief legal counsel of the Department of Human Rights dismissing Owens' charge is affirmed.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.

---

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**
**(Front Sheet to be Attached to Each Case)**

---

Please use the following
form

NICK OWENS

Petitioner-Appellant,

v.

THE DEPARTMENT OF HUMAN RIGHTS, MICHAEL LIEBERMAN, Chief Legal Counsel Designee of the Department of Human Rights, and EXXON MOBIL CORP.,

Defendants-Appellees.

---

Docket No.

COURT

Opinion
Filed

Nos.  1-09-0908

Appellate Court of Illinois
First District, SIXTH Division

  August 13, 2010
(Give month, day and year)

45

No. 1-09-0908

_____

JUSTICE JOSEPH GORDON DELIVERED THE OPINION OF THE COURT:

JUSTICES                   PRESIDING JUSTICE CAHILL, AND JUSTICE McBRIDE  concur.

Lower Court and Trial Judge(s) in form indicated in margin:

APPEAL from the

Circuit Court of Cook          Petition for Review of an Order of the Chief Legal Counsel of the Department of

County; the Hon___          Human Rights

Judge Presiding.

_____

                   Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel.  Indicate the word FOR

APPELLANTS                               NONE if not represented.

John Doe, of Chicago

For APPELLEES,  :       FOR PETITIONER-APPELLANT: Robert A. Anderson, Anderson Law Office, 10336 South Western Ave., Chicago, IL

60643, (773) 233-5385

Smith and Smith of

Chicago,                   FOR DEFENDANTS-APPELLEES: for the STATE: Lisa Madigan, Attorney General, Michael A. Scodro, Solicitor
General and Janon E. Fabiano, Assistant Attorney General, 100 W. Randolph St. 12th Floor, Chicago IL 60601, (312)
814-3312; for EXXON MOBIL CORP.: Jan Michelsen, Ogletree Deakins Nash Smoak & Stewart, P.C. 111 Monument
Circle, Suite 4600, Indianapolis, IN 46204; (317) 916-1300

Add attorneys for third-

party appellants and/or

appellees.

46